**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 10-60097-CR-UNGARO/TORRES

UNITED STATES OF AMERICA,

 Plaintiff,

v.

ANSON JOACHIN,

 Defendant.

_____/

**REPORT AND RECOMMENDATION ON CJA VOUCHER**

 On or about March 29, 2011, court-appointed defense counsel Terence Lenamon ("Counsel") submitted a voucher application numbered FLS 10 3338 requesting $87,562.50 as final payment for attorney's fees pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. [D.E. 49].[1] Counsel also provided a letter entitled "Overview of Complex Case" ("Letter Overview") in which he outlined the nature of the case and his representation of Defendant Anson Joachin ("Defendant") to support his claim for compensation in excess of the CJA statutory maximum. In addition, Counsel filed a Supplemental Information Statement and time sheets to document the work performed in the case. [D.E. 206-1 ("Supplement")].

---

[1] The amount requested exceeds the $9,700.00 statutory maximum allowed for representation in non-capital felony cases under the CJA. As a result, the Honorable Ursula Ungaro referred the voucher application to the undersigned Magistrate Judge for a Report and Recommendation as to whether the fees requested by Counsel are appropriate. [D.E. 201].

On September 1, 2011, we held a hearing on the voucher application. Counsel described the work performed in the case and provided additional documentation to support his voucher application. Based on our review of the voucher application, the supplemental materials, Counsel's explanations, and our review of the case as a whole, we hereby recommend that Counsel be awarded a total amount of $67,306.50 as fair compensation for representing Defendant in this case.

### I.   DISCUSSION

#### A.   *Applicable Standard Under the Criminal Justice Act*[2]

The CJA authorizes the appointment of counsel to represent indigent defendants charged with federal offenses. 18 U.S.C. § 3006A. At the conclusion of a CJA representation, the court shall compensate the appointed attorney for "time expended in court," "time reasonably expended out of court," and "expenses reasonably incurred." 18 U.S.C. § 3006A(d)(1). The district court, as the body empowered to "fix" CJA-appointed counsel's compensation, has the statutory authority and discretion to determine what is a reasonable expense or a reasonable use of billable time. *See* 18 U.S.C. § 3006A(d)(5); *United States v. Rodriguez*, 833 F.2d 1536, 1537-38 (11th Cir. 1987). Compensation is capped at $9,700.00, *see* Guidelines § 230.23.20(a), but a court may award a fee in excess of that amount by certifying that the case involved "extended or complex representation" and that the excess amount is "necessary to

---

[2] The Judicial Conference of the United States developed guidelines to assist courts in the application of the CJA's compensation provisions. *See In re Berger*, 498 U.S. 233, 234 (1991). The "Guidelines for Administering the CJA and Related Statutes" ("Guidelines") are contained in the Guide to Judiciary Policy, Volume 7, Part A.

provide fair compensation" to appointed counsel.  *See* 18 U.S.C. §§ 3006A(d)(2) & (3); Guidelines §§ 230.23.40(b) & (c).

A case may be considered "complex" if the legal or factual issues in a case are unusual, thus requiring the expenditure of more time, skill and effort by the lawyer than would normally be required in an average case.  *See* Guidelines § 230.23.40(b). A case may be considered "extended" if more time is reasonably required for total processing than the average case, including pre-trial and post-trial hearings.  *Id*.

### B.   *Whether the Case was "Extended" or "Complex"*

In order to approve compensation in excess of the case compensation maximum, we first must find that the representation was either complex or extended.  We find this case was complex for the reasons set forth below.

#### 1.   *Nature and Number of Charges*

First, the very nature and number of charges involved in this case required Counsel to expend more time, skill, and effort than normally required in an average case.

The case commenced on March 25, 2010 when the grand jury returned a ten-count Indictment against Defendant and three other individuals for conspiracy to commit mail fraud and wire fraud, mail fraud, wire fraud, and false statements. [D.E. 3].  Defendant, the lead defendant in the case, was charged with nine counts including conspiracy.  Thereafter the Indictment was superceded twice, on April 22, 2010 [D.E. 10] and again on July 29, 2010 [D.E. 65].  The Second Superceding Indictment included one additional defendant and added three charges against Defendant.

The government alleged that the co-defendants in this case were involved in a mortgage fraud conspiracy scheme to unlawfully enrich themselves by (a) recruiting straw buyers to purchase residential properties throughout the State of Florida and (b) submitting false and fraudulent mortgage loan applications and related documents to lending institutions, thereby inducing the lending institutions to make mortgage loans to the straw buyers for the purchase of the residential properties. According to the government, Defendant identified residential properties in the state for purchase; recruited straw buyers who lent their identities and credit histories for money to further the fraudulent purchase of the identified properties; used the names of the straw buyers on fraudulent mortgage applications even though Defendant knew the alleged borrowers had no financial interest or intent to be the true borrowers/owners or occupants of the properties; and submitted the false and fraudulent mortgage applications to various mortgage lenders in order to fraudulently procure mortgage financing for the straw buyers. The aggregate amount of the loans procured fraudulently by the co-defendants and others from the mortgage lenders was alleged to have exceeded $5,000,000.00.

Defendant individually was charged with conspiracy to commit mail fraud and wire fraud, five counts of mail fraud, and five counts of wire fraud. He faced a maximum sentence of twenty (20) years' imprisonment on each count. According to Counsel, the government considered Defendant the mastermind of the mortgage fraud conspiracy scheme.

Counsel was appointed to represent Defendant on May 26, 2010. [D.E. 16-17]. Regarding the complex nature of the case, Counsel opined that "this was not the

normal mortgage fraud case" in that there was no hard evidence of mortgage fraud by his client, i.e., it was a "paper crime, but without the defendant on any of the papers[.]" *See* Letter Overview.  Several months before the scheduled trial date, the other four defendants in the case pled guilty. [D.E. 124].  Counsel explained that the government intended to prove its case against his client by "introduc[ing] a series of cooperating witnesses, all of whom had confessed to committing the fraud in question, who would point their fingers at [Defendant] as the mastermind behind all the fraud." *See* Letter Overview.

Counsel received 11 boxes of discovery containing over 35,000 documents. *Id.* He also obtained additional substantial documents and investigative reports on the cooperating witnesses. *Id.* The documents were dense, e.g., complex mortgages, titles, deeds, trusts, real estate documents, and bank records. *See* Supplement at 1. The documents were organized by property, so case preparation required tedious cross-referencing among the five co-conspirators and the properties involved in the fraud. *Id.* The co-conspirators used aliases and were listed under multiple business names, adding to the complexity of tracing the money and sales transactions. *Id.* Close scrutiny of the documents was necessary to determine signature similarities, initials, and email addresses. *Id.* Defendant's name did not appear on many if any of the documents, and each page had to be scanned closely as well as cross-referenced. *Id.*

Counsel stated it took months to read and understand the mortgage documents in question and the relevant law. *See* Letter Overview. The court even authorized Counsel to engage an expert in mortgage and real estate lending to assess the

evidence, given the sophistication of the mortgage fraud conspiracy alleged. [D.E. 123, 126]. Literally days before the specially-set trial was to begin, the government "significantly sweetened the plea offer" by offering to recommend a sentence of 41 months' imprisonment if Defendant pled guilty to Counts I (conspiracy) and II (mail fraud). Subsequent negotiations led to a last-minute change of plea by Defendant on Friday, December 3, 2010 [D.E. 165] and averted trial that was scheduled to begin the following Monday, December 6, 2010. *Id.*

    2.    *Number and Complexity of Documents*

Second, this case was very document-intensive, and the documents themselves were quite complex. Counsel reviewed over 35,000 pages of discovery that consisted largely of mortgage papers and bank records that were sufficiently complex to warrant the hiring of a CJA-funded expert. The volume and complexity of the documents that Counsel had to review to effectively represent Defendant rendered this case more complex than the average case.

    3.    *Case was Trial-Ready*

Although the case did not proceed to trial, it very nearly did. Counsel was prepared to defend against all eleven counts in the Superceding Indictment, each count carrying a penalty of up to twenty years in prison. Each of the co-defendants pled guilty based on plea agreements with the government, and the government intended to use these witnesses to finger Defendant as the mastermind of the scheme. Counsel even hired (at his own expense) a jury consultant to help prepare for what he believed was an imminent trial.

However, a few days before the scheduled trial date, a plea deal was struck. The government agreed to drop most of the charges and recommend a reduced prison sentence in exchange for Defendant's plea of guilty to one count each of conspiracy and mail fraud. After several hours of negotiating, Defendant accepted the offer and pled guilty on a Friday, three days before the Monday that trial was to begin.

It is clear from the record that the legal and factual issues in this case were unusual. Consequently, we conclude that this matter required the expenditure of more time, skill, and effort by Counsel than would normally be required in the average case.

### C. *What is Fair Compensation*

Having concluded that the representation provided by Counsel was complex, we next determine what amount of fees in excess of the case compensation maximum will provide "fair compensation" to Counsel. *See* Guidelines § 230.23.40(c). We may consider criteria such as: the responsibilities involved measured by the magnitude and importance of the case; the manner in which the duties were performed; the knowledge, skill, efficiency, professionalism, and judgment required of and used by counsel; and the nature of counsel's practice and injury thereto; any extraordinary pressure of time or other factors under which the services were rendered; and any other circumstances relevant and material to a determination of a fair and reasonable fee. *Id*.

Counsel requested compensation in the following amounts: (a) $562.50 for 4.5 in-court hours, and (b) $87,000.00 for 696.0 out-of-court hours, for a total of $87,562.50 in attorney's fees. The out-of-court hours include 51.4 hours for "Interviews and Conferences," 443.9 hours for "Obtaining and reviewing records," 196.2 hours for

"Legal research and brief writing," and 4.5 hours for "Investigative and Other work."

   1.   *Voucher Amount - Administrator's Review*

The Court's CJA administrator first reviewed Counsel's voucher for compliance with the Guidelines and mathematical accuracy prior to our review. The CJA administrator made no changes to either the in-court or out-of-court hours. She thus concluded that the overall total amount documented by Counsel in the voucher application was $87,562.50.

   2.   *In-Court Hours*[3]

Counsel sought reimbursement in the amount of $562.50 for 4.5 in-court hours. As noted, the CJA administrator made no adjustment to the number of in-court hours. We approve the amount of $562.50 as reasonable.

   3.   *Out-of-Court Hours*

Counsel sought reimbursement in the amount of $87,000.00 based on 696.0 out-of-court hours. The CJA administrator did not adjust this number. However, at the September 1st hearing, Counsel advised the Court that he had erroneously requested compensation for 20 hours that were not billable. He conceded that the time spent on 9/30/2010, 10/1/2010, 10/4/2010, and 10/5/2010 reviewing reading materials in preparation for trial was not recoverable. Accordingly, we deduct 20 hours from the category "Legal research and brief writing" and arrive at a total of 176.2 hours for such services.

---

   [3]   We defer to the Court Clerk to verify all in-court times and expense allowances.

Our initial review of Counsel's voucher application revealed an extremely large number of out-of-court hours billed for "Obtaining and reviewing records" (443.9 hours) and "Legal research and brief writing" (now reduced to 176.2 hours). Many of Counsel's entries on the time sheets were not specific enough for us to determine whether the work performed was appropriate or necessary in this case. For example, in the "Obtaining and reviewing records" category, 41 hours were spent between June 28 and July 6, 2010 on "Discovery Summaries" and approximately 380 hours were spent between July 7 and September 29, 2010 on "Document Review." Beside each entry was a notation, presumably of the number of pages reviewed. Similarly, in the "Interviews and Conferences" category, 16 hours were spent on "FDC Visit[s]" but no explanation for the visits was provided. That contrasts with other entries in this category totaling 23.2 hours that adequately described the purpose of the FDC visits.

The aforementioned entries do not contain sufficient detail to allow us to determine whether the work performed was reasonable and necessary in this case. Accordingly, we scheduled a hearing to provide Counsel an opportunity to elaborate on his request for compensation.

At the September 1st hearing, Counsel did adequately explain the work that was performed and why it was necessary. As previously noted, over 35,000 pages of complex mortgage and banking-related documents were obtained in discovery. Counsel's paralegal indexed and cataloged a large number (though not all) of the documents. The paralegal then prepared voluminous "discovery summaries" identifying each document, its Bates-stamped number, and noting significant information relative to the document. Counsel's "minor partner," Robert Brock

("Brock"), then reviewed documents based on the paralegal's discovery summaries. Only the attorney's time was billed, not the paralegal's. It was this work by the attorney that is reflected in the "Discovery Summaries" entries.

Documents that were not summarized by the paralegal were thoroughly reviewed and analyzed by Brock in an effort to find some connection to Defendant in a case in which there was little written evidence connecting him to the alleged mortgage fraud conspiracy. Counsel supervised Brock's work, meeting with him regularly to discuss his findings and analysis. This work is reflected in the "Document Review" entries.

As for the "FDC Visit" entries, Counsel explained that numerous hours were spent with Defendant in the FDC, reviewing the many documents provided by the government as well as phone calls (in Creole) from jail that had to be reviewed with the client.

Finally, Counsel advised the Court that he did not bill for the worked performed by an associate and another partner from his firm who contributed to the defense of the case. He estimated that the total amount of work his firm performed to represent Defendant exceeded by approximately 25% the amount of time included in his voucher application.

Based on the foregoing, we conclude the number of out-of-court hours spent representing Defendant and for which compensation has been requested was reasonable and justified in this document-intensive, complex, multi-defendant mortgage fraud conspiracy case. However, a reduction in the rate at which some of these hours were billed is in order.

At the September 1st hearing, Counsel advised that the bulk of the document review was done by Brock. Brock is a relatively new lawyer. He graduated from Florida International University College of Law in 2008 and was admitted to the Florida Bar in 2010. Counsel, by contrast, graduated in 1992, was admitted to the Florida Bar in 1993, and is an AV-rated attorney who is board-certified in criminal trial. Yet the hourly rate requested in the voucher application – $125.00 per hour for all work done in the case – fails to take into account this significant difference in their experience. Accordingly, we will reduce the hourly rate for work done by the newer attorney to $75.00 per hour.

Based on Counsel's statements, we will attribute 80% of the work performed for "Obtaining and reviewing records" to Brock. Thus, whereas the original amount sought for this category totaled $55,487.50 (443.9 hours x $125.00), under our two-tiered fee schedule the reduced amount is $37,731.50.[4]

We are mindful that when considering awards to counsel under the CJA, courts have long recognized that there is an inherent tension between the policies underlying the CJA: "[o]n the one hand, representing indigent defendants is a form of public service; thus, the [CJA] was never intended to provide full compensation for an attorney's services or to provide fees equal to those charged in private practice. On the

---

[4] We arrived at this figure in this fashion: Counsel claimed a total of 443.9 hours for "Obtaining and reviewing records." Brock performed 80% of the work so 443.9 hours x 80% = 355.12 hours at a rate of $75.00 per hour = $26,634.00. Counsel performed the remaining 20% of the work so 443.9 hours x 20% = 88.78 hours at a rate of $125.00 per hour = $11,097.50. Therefore, total compensation for this category should be: $26,634.00 + $11,097.50 = $37,731.50.

other hand, the [CJA] was also intended to provide indigent defendants with meaningful representation by competent counsel[.]" *United States v. Mukhtaar*, No. 06 Cr. 31 (SWK), 2008 WL 2151798, at * 2 (S.D. N.Y. May 21, 2008) (internal citations omitted). Congress intended the CJA to "partially alleviate the financial burden" associated with the provision of services that traditionally had been provided *pro bono*. *United States v. Diaz*, 802 F. Supp. 304, 307 (C.D.Cal.1992) (quoting *United States v. Carnevale*, 624 F. Supp. 381, 383 (D.R.I.1985)). "The spirit of the statute is lost once the CJA representation of indigent defendants loses its essentially pro bono nature." *Id.*

Applying these principles to the facts in this case, and deducting the 20 hours that Counsel conceded were not billable, we conclude that an award of $66,744.00 for out-of-court hours is fair, though admittedly not full compensation for Counsel's services.

## II.   CONCLUSION

We commend Counsel for his professionalism and willingness to take this appointment. "What is commendable, however, is not necessarily compensable." *United States v. Smith*, 76 F.Supp.2d 767, 769 (S.D. Texas 1999). It is with this sentiment in mind that we recommend that the rate reduction be applied to a portion of the work performed.

As explained above, because the representation in this case was complex, we recommend that Counsel be reimbursed for an amount in excess of the $9,700.00 compensation cap. Based upon my consideration of the materials and testimony supporting the voucher application, as well as the docket and filings in this case, we

RECOMMEND that Counsel Terence Lenamon be paid a total amount of $67,306.50 as fair and final compensation for his work in this case.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of this Report and Recommendation in which to serve and file written objections, if any, with the Honorable Ursula Ungaro, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 28th day of November, 2011.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge